Myrone WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–1249.

District of Columbia Court of Appeals.

Argued May 1, 2012.

Decided June 14, 2012.

**28** 

Sydney J. Hoffmann, appointed by the court, for appellant.

Suzanne C. Nyland, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Elizabeth Trosman, and Charles W. Cobb, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE–RIGSBY and OBERLY, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Myrone Williams appeals his convictions of threatening to injure a person[1] (his wife) in early March 2008; second-degree murder (of his wife) while armed[2] a few weeks later; and related weapons offenses: possession of a firearm during a crime of violence (PFCV),[3] carrying a pistol without a license outside the home (CPWL) after a felony conviction,[4] and unlawful possession of a firearm (UF) after a felony conviction.[5] Appellant contends (1) that the evidence was insufficient for conviction of the murder and weapons offenses; (2) that the trial court violated his constitutional right to due process by failing to order removal of his leg shackles during trial; (3) that the trial court abused its discretion by admitting prejudicial evidence, including appellant's absence from his wife's funeral, to show consciousness of guilt; and (4) that the trial court erred by instructing the jury with a combination anti-dead-

---

1. D.C.Code § 22–1810 (2001) (sentenced to twenty-eight months in prison). Hereafter, all sentences to "months" refer to prison terms, and, except as otherwise indicated, all sentences are consecutive, not concurrent, sentences.

2. *Id.* §§ 22–2103, –4502 (Supp.2011) as a lesser-included charge of first-degree murder while armed (sentenced to 300 months).

3. *Id.* § 22–4504(b) (sentenced to ninety-six months).

4. *Id.* § 22–4504(a) (sentenced to twenty-eight months).

5. *Id.* § 22–4503 (sentenced to forty-two months, to run concurrently with CPWL and consecutively to all other sentences).

Appellant also received a five-year sentence of supervised release for the murder; concurrent three-year terms of supervised release for the other convictions; and an order to pay $7,500 to the Victims of Violent Crime Compensation Fund.

lock/"reasonable efforts" instruction after receiving a second note indicating that the jury could not reach a unanimous verdict on the first-degree murder charge. We conclude that none of these arguments provides a ground for reversal, and thus that all of appellant's convictions must be affirmed.

### I.

The charges grew out of the fatal shooting of appellant's wife early in the morning of March 22, 2008. According to the government's evidence, in early March, appellant's son, Myrone Hamilton (age ten), heard his mother, Bernadette Hamilton, arguing with appellant at their home about divorce papers she had had served on appellant on March 4th. During the argument, Myrone heard his father say that he would "kill her and then kill hi[m]self." At approximately 1:30 a.m., Melissa Stokes, a Detail Support Liaison with the Metropolitan Police Department (MPD), was dispatched to assist with a family disturbance report. Stokes assisted Ms. Hamilton in gathering her belongings, as well as Myrone and her older son, Tyzje, and transporting them to the nearby home of Ms. Hamilton's mother, Renae Mickens.

Two weeks later, on March 21, Ms. Hamilton, who intended to be with a friend that evening, informed her mother that appellant would be coming to their home to gather Myrone and Tyzje so that appellant could take them to his mother's home to stay with him overnight. Appellant picked up his sons that afternoon and took them to his mother's home at 1503 Tanner Street, S.E. After several hours, however, he decided to take them to their paternal aunt's house while appellant remained at his mother's home.

Appellant's brother, Jeffrey Mosley, testified that at approximately midnight on March 22, 2008, he was with appellant at their mother's house and that appellant had "a gun on him," a "nine ... [m]illimeter." Mosley further testified that the gun had been "in [Mosley's] room on the floor" and was gone when appellant left. Another government witness, MPD homicide Detective Joshua Branson, testified with reference to exhibits in evidence that at "about" 12:25 a.m. on March 22, Bernadette Hamilton placed a call to appellant's cell phone. Referring to that time period soon after appellant had left, Mosley testified that he saw a car outside the house that he believed was Bernadette Hamilton's.[6]

Around that time, several neighbors heard gunshots and looked outside to see what was happening. Lakeisha Walker, who was at her home near 15th Place and Tanner Street, S.E., looked out her window, overlooking Tanner Street, and saw the backside of a man with long "braids, cornrows, or pla[i]ts" as a hairstyle, wearing blue jeans, a white shirt, and a cap, shooting into the driver's side of a dark-colored car.[7] Neighbor Janee Carter also heard the gunshots, looked out her window, and saw a blue car in motion on the sidewalk. When she went outside she saw a deceased female, Bernadette Hamilton,[8] sitting in the driver's seat with a dog

---

6. Mosley also testified, on cross-examination, that he typically drank some thirty beers a night and was drunk on the night of the shooting.

7. According to Mosley, appellant wore his hair shoulder-length in a dreadlocks hairstyle.

8. The parties stipulated that Bernadette Hamilton was found dead inside the car at 12:30 a.m.

resting on her chest, licking her face.[9] Melvin Carter also looked out his window and saw a man shooting into the driver's side window of a car while using profanity and screaming "bitch." He described the shooter as wearing a black shirt, black shoes, and blue jeans, with his hair styled in dreadlocks. Carter's girlfriend, Jocelyn Aull, described the shooter as wearing a black jacket, blue jeans, and a cap on his head.

Another government witness, Travis Archie, had not seen the shooting but heard the gunshots, knew appellant, and no more than fifteen seconds after the shots stopped saw appellant walking away from the direction of the shooting. Archie testified, as Aull had described the shooter, that appellant was dressed in a black jacket, blue jeans, and a cap.[10] Much like Walker, who saw "braids, cornrows, or pla[i]ts," and Melvin Carter, who saw "dreadlocks," Archie saw "dreads or cornrows" on appellant. And Archie, like Aull and Walker, saw a cap. The only inconsistency among all the observers was Walker's reference to a white shirt. (Also, those who described a hairstyle varied somewhat in their descriptions of the length, but not general style, of the hair.)

The government also presented evidence of Bernadette Hamilton's wounds and their source. The District of Columbia Medical Examiner, Lois Golinski, M.D., had conducted the autopsy and found twelve bullet wounds in various parts of Bernadette Hamilton's body including her neck, vertebrae, jaw, chest, left shoulder, and left arm. MPD firearms expert Michael Mulderig found that the nine-millimeter cartridges and the nine-millimeter bullets recovered from the scene of the crime were all from the same gun. The police did not, however, locate the gun.

## II.

■ We consider, first, appellant's contention that the evidence was insufficient to convict him of second-degree murder while armed and the related weapons charges (he does not challenge evidentiary sufficiency for his threats conviction). Because of a defense concession and pretrial stipulation, our decision as to whether the evidence was sufficient to support appellant's conviction of second-degree murder while armed will resolve all weapons convictions as well.[11]

For second-degree murder, "the government was required to prove that [appellant] (1) caused the death of the victim;

9. Many of the witnesses testified about the dog (identified as the family dog) resting on Ms. Hamilton's chest.

10. On cross-examination, Archie admitted that he had smoked three or four marijuana joints and drunk alcohol before he heard the gunshots. He did not go to the police until several days later and, even then, provided the police with a false name, at first, because he feared being arrested himself on a warrant. Appellant's only witness, Joshua Branson, who was initially a government witness, merely testified that Archie had been questioned by the police after Archie's girlfriend informed them that he had information about the murder.

11. Appellant stipulated with the government that Count Five (Count Four on the Jury Verdict Form, see *infra* note 70), PFCV, and the lesser offense of Count Six (Count Five on the Jury Verdict Form, see *infra* note 70), CPWL, would be presented to the jury, and if the jury found him guilty of either PFCV or CPWL, the court would enter a verdict against him on the greater charge of CPWL by a felon and/or UF by a felon. If the evidence was sufficient to convict appellant of second-degree murder *while* armed, we may reasonably conclude that the evidence was sufficient for his PFCV and CPWL (March 22) convictions, as all three convictions draw upon the same evidence of his using a firearm in the March 22nd murder.

[and] (2) had the specific intent to kill or ... seriously injure the decedent, or acted in conscious disregard of an extreme risk of death or serious bodily injury to the decedent; [provided] that (3) there were no mitigating circumstances."[12] Focusing on the first element, appellant claims insufficiency because, he says, none of the eyewitnesses could identify appellant as the shooter; their descriptions of the unidentified shooter varied; some witnesses could provide no physical description of the shooter; and some descriptions of the shooter varied from the description that the government's principal witness, Travis Archie, gave for appellant (whom he knew). Further, argues appellant, Mosley was drunk when he claimed he saw appellant leave the house, and Archie was high at the time of his eyewitness observation of appellant running away that night. Finally, appellant stresses, no forensic evidence connected appellant to the shooting; no murder weapon was recovered; and he did not incriminate himself.

In reviewing for sufficiency of the evidence, we have often observed that this court

> must view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. We do not distinguish between direct and circumstantial evidence, and the government is not required to negate every possible inference of innocence. Rather, it is only where the government has

produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction.[13]

Based on these criteria, appellant's sufficiency argument fails. Ample evidence supports reasonable jury findings that appellant was the shooter who caused his wife's death, that he had the specific intent to kill her (twelve bullets while she sat in her car), and that no circumstances mitigated the charge of second-degree murder while armed.[14] Appellant's brother, Jeffrey Mosley, testified that on the evening of the murder (when Mosley admittedly was drunk),[15] appellant left the house at about midnight having apparently taken his nine-millimeter handgun—the kind of weapon that the government expert testified was used to kill Bernadette Hamilton. Detective Branson testified that, at about 12:25 a.m., Hamilton placed a call to appellant's cell phone, and Mosley testified that shortly thereafter he saw a car that he believed was Hamilton's outside his mother's house (where Mosley lived and appellant had stayed that evening). At about that time, less than a half hour after appellant had left the house with a nine-millimeter handgun, Hamilton was shot in the driver's seat of her car. We have summarized in Part I the descriptions of the shooter by the eyewitnesses, as well as the description of appellant by Archie, a man who knew appellant and saw him in the area of the shooting within seconds after it happened. The descriptions by the eye-

---

12. *Mitchell v. United States*, 985 A.2d 1125, 1135 (D.C.2009) (internal quotation marks omitted) (citing *Comber v. United States*, 584 A.2d 26, 38–39 (D.C.1990) (en banc)); *supra* note 2. The "while armed" element is additional to the quoted elements of second-degree murder. *See* D.C.Code § 22–4502 (Supp.2011).

13. *Coleman v. United States*, 948 A.2d 534, 550 (D.C.2008) (quoting *Freeman v. United States*, 912 A.2d 1213, 1218–19 (D.C.2006)) (internal quotation marks omitted); *see also, e.g., Paige v. United States*, 25 A.3d 74, 89 (D.C.2011).

14. *See Mitchell*, 985 A.2d at 1135.

15. *See supra* note 6.

witnesses, as well as the description by Archie, when compared with those of the eyewitnesses, show remarkable consistency. In any event, "[c]ontradictions between the testimony from various witnesses [are] unremarkable, and in and of [themselves are] not enough to reverse a jury."[16] Furthermore, it is for the jury, not this court, to assess appellant's contentions that impairments of Mosley and Archie clouded their perceptions of what happened.[17]

In sum, the evidence was sufficient for conviction of second-degree murder while armed; and, given appellant's concession as to PFCV and his pretrial stipulation as to the other weapons offenses,[18] we must conclude that the evidence also suffices for conviction of PFCV, CPWL after a felony conviction, and UF after a felony conviction.

### III.

■ Appellant argues that the trial court violated his constitutional right to due process by refusing to grant his request for removal of his leg shackles without a reasoned factual finding for doing so.

At a preliminary hearing, the trial court asked a United States marshal whether appellant had been "compliant with the instructions" while in the marshal's custody. The marshal replied, "He has not, ... he refused to get dressed." Addressing appellant, the court said: "Mr. Williams, normally I have the cuffs taken off, but I need to make sure that the Marshals are satisfied with the proceedings. So, right now the cuffs will just stay on until we get a little closer to the trial." The next day, a marshal informed the court that appellant

had "refused to leave his cellblock this morning." The marshal then brought appellant to the courtroom, whereupon appellant said, "I want another attorney." The court denied the request, adding:

> My difficulty Mr. Williams is that in trial you're entitled to make the best presentation possible. You're entitle[d] to dress in civilian clothes if you like. You're entitled to be without cuffs if you like. I—you're just putting me in a difficult position, because those things can work for you.

Appellant responded, "I haven't been violent with anybody. ... I just said I'm not going upstairs," to which the court replied, "All right" and offered him a "change into street clothes in preparation for trial." Just before the jury was brought into the courtroom, defense counsel objected to the leg shackles:

> [M]y client is sitting here at counsel table. He does have ... leg shackles on. *There is an apron around ... the front of the counsel table,* but I would object to my client being shackled here, ... in front of the jury. I don't think he's behaved ... in a violent or aggressive manner. ... *The jury ... would realize ... that something is going on here for there to be an apron around,* so I would object, ... and ask that the shackles be removed. [Emphasis added.]

The court answered by pointing out the distinctiveness of the particular courtroom they were in, which included "huge plasma monitors" and skirts around the tables where the prosecutor as well as appellant and defense counsel were sitting—with all skirts matching "the fabric that's on the seats in the courtroom and the jury box."

---

16. *Paige,* 25 A.3d at 90 (first alteration in original) (quoting *Graham v. United States,* 12 A.3d 1159, 1163 (D.C.2011)) (internal quotation marks omitted).

17. *Coleman,* 948 A.2d at 550.

18. *See supra* note 11.

The jury may wonder why I have all these plasma monitors in the courtroom and *why the curtains are on the tables,* but certainly that's not prejudicial to your client because they wonder about that. I need for your client to satisfy us by his conduct—and today could very well be helpful to us.... And ... once we're satisfied, then we'll ... seriously consider granting your request, but right now your request is denied. *The curtains are to hide from the jury the fact that Mr. Williams is in shackles.* [Emphasis added.]

The next day, the second day of trial, defense counsel again asked whether the leg shackles could be removed. The court replied that it had "discussed the issue yesterday with the Marshal. And he is continuing to assess things with respect to a point at which we can remove the leg irons. All that I would ask is that Mr. Williams continue to cooperate with the Marshal. It will happen, but not right now."

The issue was not raised the following trial day but came up again on the fourth (and last) day of trial, when the trial court said to defense counsel before closing arguments to the jury:

I just wanted to note for the record, ... you requested that the leg shackles be removed from Mr. Williams. And I had indicated that this was an issue that Marshals would make an assessment of. And as of today, he is not wearing the shackles.... Well, they were removed, and ... we asked Mr. Williams to continue with his compliance with instructions of the Marshals, and the shackles will stay off.

From the trial court's comments, and defense counsel's acknowledgment, it is clear that the shackles were not visible to the jury; and, as a further precaution, the same apron, as the trial court noted (and appellant does not dispute), surrounded the prosecutors' table. The question, then, is whether the circumstances reflected a violation of appellant's constitutional right to due process.

In *Deck v. Missouri,*[19] the Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible to the jury* absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."[20] The Court based its decision on "three fundamental legal principles:"[21] (1) "the criminal process presumes that the defendant is innocent until proved

**19.** 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).

**20.** *Id.* at 629, 125 S.Ct. 2007 (emphasis added); *accord Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) ("[T]he State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes."); *see also Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) ("The first issue to be considered here is thus whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."); *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ("But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.").

**21.** *Deck,* 544 U.S. at 630, 125 S.Ct. 2007.

guilty"; [22] (2) "a right to counsel"; [23] and (3) "[t]he courtroom's formal dignity, which includes the respectful treatment of defendants." [24]

At trial, counsel's objection to appellant's leg shackles was limited to his concern about the first and third principles undergirding *Deck:* prohibition on visible shackles because of their implication that a defendant is guilty and unworthy of dignified treatment-a focus on the jurors' perception. As we have noted, the facts do not support that concern. The jurors, the trial court explained, would not be drawn to the table skirts because they were on both tables, the fabric matched the fabric on the seats in the jury box, and the courtroom was distinctive with its plasma monitors. Thus, "the jury would have had no reason to draw any adverse inference from the appearance of the defense table." [25]

However, the second principle—communication with counsel and effective participation in one's defense—is different; those concerns can affect a defendant, at least psychologically, by both concealed and revealed restraints, as case law from jurisdictions dealing with "stun belts" has recognized.[26] Defense counsel at trial, however, did not raise this "communication" issue; it is presented for the first time on appeal. But even if counsel's trial objection was sufficient to embrace all rationales that have informed the Supreme Court's ruling in *Deck,* and even if we ignore the substantial number of cases ruling that invisible restraints at trial are not limited by *Deck,*[27] we cannot find harmful constitutional error. There is not even a

**22.** *Id.* The Court added that visible shackling not only undermines the presumption of innocence but also "the related fairness of the factfinding process." *Id.*

**23.** *Id.* at 631, 125 S.Ct. 2007. The Court explained that physical restraints diminish the right to counsel because they can "interfere with the accused's ability to communicate with his lawyer" and "to participate in his own defense, say by freely choosing whether to take the witness stand on his own behalf." *Id.* (citation and internal quotation marks omitted).

**24.** *Id.* ("The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives.").

**25.** *See United States v. Cooper,* 591 F.3d 582, 588 (7th Cir.2010) ("Critically, these were not *visible* shackles. The record indicates instead that the jury could not see the shackles, because Cooper was sitting at a skirted table, rendering his ankles invisible. The government's table was similarly skirted, and so the jury would have had no reason to draw any adverse inference from the appearance of the defense table.").

**26.** *See United States v. Durham,* 287 F.3d 1297, 1300, 1302, 1305 (11th Cir.2002) (although "stun belt" was not readily visible at

trial, it was nonetheless inherently prejudicial, in absence of particularized findings, because of fear that accidental electric shock might impact defendant's ability to communicate with counsel or otherwise participate in defense); *People v. Allen,* 222 Ill.2d 340, 305 Ill.Dec. 544, 856 N.E.2d 349, 352 (2006) ("*Deck* Court's stated reasons which prompt due process scrutiny in visible restraint cases ... may be applied with like force to stun belts which are not necessarily visible to the jury").

**27.** *See United States v. Wardell,* 591 F.3d 1279, 1294, 1297–98 (10th Cir.2009) (concluding that "a district court's decision to require a defendant to wear a stun belt during a criminal trial would appear ordinarily to pose no constitutional problem when: (1) the court makes a defendant-specific determination of necessity resulting from security concerns; and (2) it minimizes the risk of prejudice by, for instance, concealing the stun belt from the jury," and concluding that there was no plain error with respect to appellant's contention that wearing a stun belt had a psychological impact on his ability to represent himself); *Mendoza v. Berghuis,* 544 F.3d 650, 654 (6th Cir.2008) ("*Deck's* facts and holding ... concerned only *visible* restraints at trial. The Supreme Court was careful to repeat this limitation throughout its opinion."); *United*

hint here that appellant could not confer productively with counsel and participate actively in his defense.[28] For that reason, as well as the undisputed evidence that the jury had no discernible basis for believing that appellant was present at trial under restraint, appellant's shackling argument must fail.[29]

## IV.

Appellant maintains that the trial court abused its discretion in admitting three kinds of evidence leading to prejudice that "substantially outweighed" any probative value:[30] (1) appellant's failure to attend his deceased wife's funeral, (2) his failure to see his young sons since the day before

States v. Baker, 432 F.3d 1189, 1245–46 (11th Cir.2005) (even if district court's failure to justify shackling was abuse of discretion, prejudice to defendant was insufficient because shackles were not visible to jury and did not undermine presumption of innocence); State v. Johnson, 148 N.M. 50, 229 P.3d 523, 533 (2010) (concluding, where appellant made no objection at trial, that appellant failed to demonstrate "fundamental" error because "where a defendant is restrained in a manner not visible to the jury, prejudice is not presumed," and appellant failed to demonstrate prejudice).

**28.** See United States v. Moore, 397 U.S.App. D.C. 148, 165, 651 F.3d 30, 47 (2011) (concluding trial court did not abuse discretion by permitting use of stun belt, without making specific findings that use of belt affected appellants' ability to confer with counsel, where appellants "offered us no evidence stun belts in any way affected their communication with their counsel or their participation in their defense"); Cooper, 591 F.3d at 588–89 (no plain error where restraints were not visible and appellant's "standby lawyer was sitting right next to him, and so the shackling did not impede his access to legal advice").

**29.** Appellant also argues—based in large part on the trial court's failure to make specific findings of need for the shackles—that the trial court impermissibly delegated to the marshals its responsibility for determining the need for the shackles. See State v. Dixon, 226 Ariz. 545, 250 P.3d 1174, 1180 (2011); People v. Hernandez, 51 Cal.4th 733, 121 Cal.Rptr.3d 103, 247 P.3d 167, 169 (2011).

As to the lack of particularized findings, the Supreme Court in Deck did not discuss whether express findings would be required to justify leg shackles that were not visible, and at least two U.S. Courts of Appeal have indicated that this question of due process is open. See Cooper, 591 F.3d at 588–89 (finding no plain error partly because shackles

were not visible, but calling lack of particularized findings "regrettable"); United States v. Howard, 480 F.3d 1005, 1013 (9th Cir.2007) (argument that no restraints may be used without individualized determination of need "may go farther than due process requires").

We need not definitively resolve the factfinding requirements in the context of invisible restraints. On the facts here, this argument has no merit for the delegation issue because the trial court's reasoning was clear. Recall that on one of the days before trial, appellant refused to get dressed. The next day he refused to leave his cell. On the face of things, therefore, shackling him for trial did not appear to be an extraordinary decision. On the second day of trial, after appellant requested that the shackles be removed, the trial court informed appellant that the court had "discussed the issue yesterday with the Marshal. And he is continuing to assess things with respect to a point at which we can remove the leg irons. All that I would ask is that Mr. Williams continue to cooperate with the Marshal. It will happen, but not right now." The trial court, therefore, appeared to be gathering information from the marshal based on the marshal's first-hand observation of appellant. Moreover, a reading consistent with appellant's argument is untenable in the context of the multiple exchanges between the trial court and appellant, in which the court clearly tried to ascertain from the marshals the level of appellant's cooperation in order for the court to determine whether removal of the shackles was appropriate. All things considered, the trial court was sensitive not only to concerns about public safety, but also to the needs of appellant himself—encouraging him, for example, to dress suitably for trial. The court handled the matter well, consistent with appellant's right to due process.

**30.** (William) Johnson v. United States, 683 A.2d 1087, 1099–1100 (D.C.1996) (en banc) (adopting FED R.EVID. 403).

their mother's death, and (3) discovery of the family dog licking their mother's corpse in the car where she was killed.

Before trial, defense counsel filed a motion *in limine* to exclude from admissible evidence the fact that appellant "did not go to the funeral of the decedent which was several days after the homicide." Counsel stressed that this fact was "not relevant"; it was "more prejudicial than probative that the . . . husband of the wife who was killed didn't appear at the funeral[,] . . . [a]nd the jury may infer guilt[ ]" from that fact. Counsel argued that there were "all kinds of explanations" why his client did not attend the funeral: (1) "the day following the homicide, he was taken in for questioning by the police," and "everybody in the family believed that he was guilty of the homicide"; (2) furthermore, "[t]here were threats made." [31]

Appellant then adds that, although not expressly raised at trial, the motion *in limine* "encompassed all evidence regarding Williams's conduct toward his children in the aftermath of the death of their mother," including his failure to see them since the day before she died. Finally, appellant folds in a second argument not raised at trial: that the court abused its discretion in permitting the government to present evidence that the family dog was found in the vehicle with Bernadette Hamilton, after her death, licking her face. The dog's behavior, appellant contends, was wholly irrelevant, inflammatory, prejudicial, and satisfies plain error review. In sum, appellant stresses that the challenged evidence was particularly harmful given the "weak" government case—weak because no one could precisely identify appellant as the shooter.

The government counters that the "evidence was directly relevant to show that appellant was not on good terms with his wife and to show consciousness of guilt." The jury could reasonably infer, says the government, that appellant would have attended the funeral and cared for his sons had he not been responsible for her death. The government also adds that, in any event, admission of the evidence that appellant did not attend the funeral would be harmless, if error, for three reasons: (1) appellant provided the jury (through cross-examination of his sons) with the alternative, reasonable explanation that he stayed away because of the Hamilton family's hostility to him; (2) the point was not unduly emphasized, as the government did not mention his absence from the funeral during closing argument; and (3) there was "ample . . . evidence of appellant's guilt" despite any prejudice from the funeral evidence.

As to the other two claims of unduly prejudicial evidence, the government reminds us, first, that trial counsel did not object to the evidence of appellant's failure to stay in contact with his sons after their mother's death. Nor did he object to evidence of the family dog's behavior after the murder. These evidentiary contentions, says the government, are therefore limited-and we agree-to plain error review. The government then stresses that appellant's failure to contact his sons after the murder reflects additional consciousness of guilt, and that the family dog's behavior after the murder, in the context of appellant's screaming "bitch" and shooting Bernadette Hamilton ten (actually twelve) times, was not particularly prejudicial.

In ruling on appellant's motion *in limine,* the trial court rejected counsel's argument that

---

**31.** The record, as appellant correctly observes, fails to show when the funeral took place or whether appellant was in jail at the time.

there could be any number of reasons why the defendant did not go to the funeral. Including the fact[ ] that all of [the] relatives perhaps thought that it was the defendant who committed the offense. That may well be the case, but it's compelling on these circumstances. The evidence may be consciousness of guilt that the defendant did not attend the funeral. So, that will be permitted.

The court added that it would "be prepared, during the course of the trial, to give an instruction on consciousness of guilt, if that's what you would request. So that the jury would be limited in how they would consider such evidence."

At trial, both of appellant's sons testified, over objection, that their father did not attend the funeral. Defense counsel did not request the limiting instruction the court had offered. Later, the government asked each of the sons, without objection, whether he had seen or spoken with his father since their mother's death, and each replied that he had not. Finally, during examination of evidence about the crime scene, the government elicited testimony, again without objection, that the family dog had been in the car with Bernadette Hamilton licking her face after her death. The government repeated this evidence about the dog twice during closing argument.

■■■ We review a trial court's decision to admit or exclude evidence for abuse of discretion.[32] "Relevant evidence is simply

that which tends to make the existence or nonexistence of a [contested] fact more or less probable than it would be without the evidence."[33] Moreover, "the fact sought to be established by the evidence must be material, which is to say that the party must establish that fact as a condition to prevailing on the merits of his case."[34] Finally, "any evidence which is logically probative of some fact in issue" is ordinarily admissible "unless it conflicts with some settled exclusionary rule."[35] In sum, "[i]f the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury."[36]

■■■ The government does not even attempt to justify admission of evidence about the family dog, other than to say that it was "not more prejudicial or shocking than the evidence"—offered by the government without objection—that "appellant, while screaming 'bitch,' shot [his wife] ten times as she sat in the car." We agree with appellant that this evidence was not relevant, let alone material or probative, toward proof of some fact at issue. And even if one could postulate a smidgen of relevance, this evidence was so highly inflammatory that any probative value was " 'substantially outweighed by the danger of unfair prejudice.' "[37] Had there been an objection, it should, and we trust would, have been sustained. All that said, however, and keeping in mind that admission of

**32.** See, e.g., Goines v. United States, 905 A.2d 795, 799 (D.C.2006).

**33.** Busey v. United States, 747 A.2d 1153, 1165 (D.C.2000) (alteration in original) (quoting Punch v. United States, 377 A.2d 1353, 1358 (D.C.1977)) (internal quotation marks omitted).

**34.** Reavis v. United States, 395 A.2d 75, 78 (D.C.1978).

**35.** Dockery v. United States, 746 A.2d 303, 306 (D.C.2000) (quoting Martin v. United States, 606 A.2d 120, 128 (D.C.1991)) (internal quotation marks omitted).

**36.** Id. at 306–07 (internal quotation marks omitted).

**37.** (William) Johnson v. United States, 683 A.2d 1087, 1099 (D.C.1996) (en banc) (quoting FED.R.EVID. 403).

this evidence is subject to plain error review, we cannot conclude that its admission "affected appellant's substantial rights,"[38] given the considerable evidence—much of it inflammatory—establishing his guilt.

■ Plain error review also does not rescue appellant's claim of prejudicial error in admission of the evidence that appellant had not seen his sons since the day before their mother's death. (This evidence is not embraced, by any reasonable stretch, within appellant's motion *in limine* concerning the funeral.) We recognize that the government did not proffer foundational evidence to establish how it would have been possible for appellant to see his sons during the period between his arrest (March 2008) and trial (June 2009), given appellant's confinement and the sons' residence with their mother's family—a family intensely hostile to their father. The very facts relevant to this alleged consciousness of guilt are elusive; thus the probative value of the evidence is questionable.

On the other hand, a father would normally and naturally want to comfort his children upon the death of their mother,[39] and visits by family members to an incarcerated suspect are commonplace. Thus,

evidence of appellant's failure to reach out to his sons would seem to reflect a guilty conscience even more than his failure to attend their mother's funeral. Accordingly, once it was clear that the government was going to elicit this absent-father testimony, it is significant that appellant failed to object and failed to contest admission of that testimony by proffering evidence of an effort to see his sons, if only through testimony by officials at the jail with whom he could have pursued the possibility of telephone contact with his sons.[40] These failures leave us unwilling to second-guess the trial court's discretionary judgment (implicit in the absence of objection) not to intervene *sua sponte;* we cannot gainsay a judgment to admit uncontested though relevant evidence that could be taken to expose a state of mind more guilty than remorseful. Again, absent objection, we perceive no prejudicial effect on appellant's "substantial rights" or on the "fairness, integrity, or public reputation of judicial proceedings."[41]

■ We therefore turn, finally, to appellant's pretrial motion challenging admission of the evidence that appellant did not attend his wife's funeral—another category of evidence admitted to show consciousness of guilt.[42] Perhaps most com-

---

38. *Lowery v. United States,* 3 A.3d 1169, 1173 (D.C.2010) (internal quotation marks omitted); *see United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

39. *See Allen v. United States,* 603 A.2d 1219, 1233 (D.C.1992) (en banc) (Rogers, C.J., concurring) ("To raise such a[ ] [consciousness of guilt] inference the government must show that the defendant did not act as an innocent person in the defendant's situation would naturally have acted, but rather acted as would a guilty person under the circumstances. *The inference rests on often unarticulated assumptions about what a reasonable person who is innocent of any crime would do."* (emphasis added)).

40. *Id.* (Rogers, C.J., concurring) ("Whether the introduction of nonaction by the defendant would be more prejudicial than probative may depend on the extent to which the defendant is afforded the opportunity to present, and is not prevented by law from presenting, an explanation to the jury for his nonconduct.").

41. *Lowery,* 3 A.3d at 1173 (internal quotation marks omitted).

42. In *Mungo v. United States,* 987 A.2d 1145, 1157 (D.C.2010), this court briefly considered a government argument that "appellants' non-attendance at the victims' funerals evinced consciousness of guilt," countered by

monly, evidence of guilt-consciousness—derived from a defendant's conduct after the crime was committed [43]—comes from flight from the crime scene, the police, or a courtroom,[44] or from threats to eyewitnesses, earwitnesses, or law-enforcement officers.[45] But consciousness of guilt can be evident from a variety of other contexts.[46] However, the strength of that inference will vary, depending on the context. Consciousness of guilt is likely to be readily discernible, for example, from a defendant's threat to an eyewitness to the crime or attempted bribery of an official; [47]

on the other hand, flight from a crime scene,[48] like refusal to give a blood sample [49] or failure to inquire about a police investigation of a spouse's murder,[50] "may be prompted by a variety of motives." [51] Thus, before evidence is admissible to establish consciousness of guilt, the court must be satisfied, that the chain of inferences connecting the defendant's post-crime conduct to the crime itself would allow a reasonable jury to find that the conduct was inconsistent with that of an innocent person.[52] Furthermore, because in most instances the defendant's conduct

the appellants' contention that "this evidence had little probative value, but painted a picture of them as thoughtless, uncaring individuals." Without resolving admissibility, we concluded that any error would have been harmless "in light of the eyewitness testimony the government presented (eyewitness testimony that the trial court described as '[s]trong')." *Id.* (alteration in original). *Mungo*, therefore, does not help here with admissibility.

**43.** *See Burgess v. United States*, 786 A.2d 561, 569 (D.C.2001) ("Threats, bribery, flight, and similar post-crime conduct have repeatedly been held to evince consciousness of guilt and thus constitute admissions by conduct" (internal quotation marks omitted)).

**44.** *See Smith v. United States*, 777 A.2d 801, 808 (D.C.2001) (citing cases) (sustaining admission of attempted flight from preliminary hearing as evidence of guilt consciousness).

**45.** *See Haney v. United States*, No. 10–CF 150, 2012 WL 1427794, at *2, *3 (D.C. April 26, 2012) (citing cases) (sustaining admission of threats by defendant against police witness at preliminary hearing)

**46.** *See, e.g., Allen v. United States*, 603 A.2d 1219, 1233 (D.C.1992) (en banc) (Rogers, C.J., concurring) (failing to preserve evidence at crime scene in support of self-defense claim); *United States v. Kuehne*, 547 F.3d 667, 691–92 (6th Cir.2008) (tampering with evidence); *United States v. Cody*, 498 F.3d 582, 591–92 (6th Cir.2007) (engaging in suicidal ideation); *United States v. Wright*, 392 F.3d 1269, 1276–77 (11th Cir.2004) (resisting arrest); *United States v. Rea*, 958 F.2d 1206,

1220 (2d Cir.1992) (making false exculpatory statement); *McKinney v. Galvin*, 701 F.2d 584, 587 (6th Cir.1983) (refusing blood-alcohol test); *United States v. Khamis*, 674 F.2d 390, 395 (5th Cir.1982) (using false identity).

**47.** *See United States v. Turner*, 158 U.S.App. D.C. 197, 206–07, 485 F.2d 976, 985–86 (1973) (bribery).

**48.** *See Smith*, 777 A.2d at 808 ("flight from the scene of a crime or upon perception of law enforcement" is "the type of flight evidence most commonly seen by courts," but "flight evidence can include escape or attempted escape from confinement or custody").

**49.** *See Thomas v. State*, 372 Md. 342, 812 A.2d 1050, 1058–59 (2002).

**50.** *See Snyder v. State*, 361 Md. 580, 762 A.2d 125, 134 (2000).

**51.** *Smith*, 777 A.2d at 807–08.

**52.** The leading case creating a required chain of inferences, cited in this jurisdiction and elsewhere, is *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977) (cited in *Smith*, 777 A.2d at 806–07 nn. 9 & 10 and *Scott v. United States*, 412 A.2d 364, 371 (D.C.1980)) (reciting chain of inferences required to establish consciousness of guilt from flight); see *Snyder*, 762 A.2d at 134 (reciting chain of inferences required to establish consciousness of guilt from husband's failure to inquire about police investigation of wife's murder); see also *Allen v. United States*, 603 A.2d 1219, 1233 (D.C.1992) (en banc) (Rogers, C.J., con-

will likely be susceptible to an innocent as well as a guilty explanation, the trial court will be obliged—as we have said with respect to "flight"—to "fully apprise the jury" that it must use "caution" before inferring guilt from that conduct.[53]

On the face of it—that is, when considered without regard to context—it seems evident that the failure of a criminal suspect, still at liberty, to attend the funeral of his wife after her apparent murder is inconsistent with the way an innocent person would have acted.[54] Thus, we are satisfied that appellant's absence from Bernadette Hamilton's funeral—without reference to any explanation for avoiding it—is a candidate for admission as probative evidence showing his consciousness of guilt of the homicide. No less than in a flight case, however, the failure of a man suspected of killing his estranged wife may have "a variety of motives,"[55] even while still at liberty, for failing to attend her funeral. And, of course, he is entitled to challenge admissibility of that conduct, either by undermining the chain of inferences necessary to give it probative value or by arguing that, whatever its probative value, that value "is substantially outweighed by [the] danger of . . . unfair prejudice."[56]

Whatever analytic premise we use, probative value or unfair prejudice, the inquiry shifts to context—to appellant's proffered explanations for staying away from the funeral. In contrast with appellant's failure to ask for exclusion of testimony that he did not see his sons after their mother's death, his counsel, beginning with the pretrial motion *in limine,* vigorously attempted to keep the funeral evidence out of the case by proffering two explanations for why appellant stayed away: his anticipated discomfort in joining his estranged wife's family, given their belief that he was the murderer, and threats against him from the family. With these proffers before the court, the government's *prima facie* showing—that, in his situation, the defendant did not act in the way that an innocent person "would naturally have acted"[57]—was potentially in jeopardy. But the judge admitted the evidence with little discussion and without making findings that weighed probative value against prejudicial effect.

At trial, to rebut the perception of guilt-consciousness, counsel elicited on

curring) (reciting chain of inferences required to establish consciousness of guilt from defendant's failure to preserve evidence from crime scene that would have supported self-defense claim).

53. *Smith,* 777 A.2d at 807–08 (internal quotation marks omitted).

54. Our "evident" conclusion—without regard to context—is derived from the following chain of inferences:

> (1) Failure to attend the funeral reflects defendant's decision not to do so; (2) defendant's decision not to do so reflects consciousness of guilt from not doing what a normal, innocent spouse would do; (3) failure to do what a normal, innocent spouse would do reflects consciousness of guilt about the murder; and (4) consciousness of

guilt about the murder reflects actual guilt of the murder.
*See supra* note 52.

55. *Smith,* 777 A.2d at 808 (internal quotation marks omitted).

56. FED.R.EVID. 403; *(William) Johnson v. United States,* 683 A.2d 1087, 1099 n. 13 (D.C.1996) (quoting former style of FED. R.EVID 403). We have defined "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Plummer v. United States,* 813 A.2d 182, 189 (D.C.2002) (quoting *Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999)) (internal quotation marks omitted).

57. *Allen,* 603 A.2d at 1233 (Rogers, C.J., concurring); *supra* note 40.

cross-examination of appellants' sons that their deceased mother's family believed that appellant had shot and killed their mother, a plausible excuse for avoiding the funeral that nonetheless included more than a little self-inflicted prejudice. As to the other proffered ground for his absence, appellant did not attempt to establish the alleged threats from his wife's family, perhaps because he chose not to testify and was not otherwise in a position to establish the threats (if, in fact, they had happened). Therefore, absent much offsetting explanation, there is little reason why the jury would not have perceived a guilty conscience from the failure of a criminal defendant to attend the funeral of an estranged wife he was charged with murdering.

Without trial court findings that the probative value of appellant's absence (reflecting guilt-consciousness) exceeded its prejudicial impact (inflaming the jury), we cannot say as a matter of law that the funeral evidence was properly admitted, especially because "improper inferences [based on defendant's inaction] are likely to be over-valued by juries." [58] Moreover, because the trial court did not explore appellant's proffers, we do not know whether counsel could have established them both to the court's satisfaction. We may wonder how appellant could confirm the alleged threats. But the court had no reason to doubt that appellant stayed away, at least in part, because of the belief by his wife's family that he was the murderer—a reason revealed on cross-examination of his son that was as inculpatory

as exonerative. In context, therefore, guilt-consciousness was not the only logical inference from appellant's non-action,[59] and thus its relevance, materiality, and probative value in establishing appellant's guilt were marginal at best compared with the mischief likely brought to the jurors' minds. If the action that allegedly creates the inference (absence from funeral) suggests, as it does here, a reasonable alternative interpretation (family hostility), the probative value largely, if not completely, disappears.

In sum, the failure to attend the funeral of one's wife after her murder, when considered without further information, is inconsistent with the way a reasonable person would have acted.[60] But the same cannot be said when the victim of the murder was in the process of divorcing the accused, and the family members of the victim have made clear their belief that the accused committed the murder. Under such circumstances, the failure of the accused to attend the funeral of the victim, although free to do so, will be reasonable, if not entirely to be expected, and cannot be said to evidence more than residual, if any, probative value of a guilty conscience—perforce value "substantially outweighed" by the danger of "unfair prejudice" its admission would bring.[61]

■ Accordingly, the "trial court exercise[d] its discretion erroneously," and thus the question becomes whether this error is "of a magnitude to require reversal." [62] We conclude that reversal is not required; the prejudice from admission of the funeral evidence is eclipsed by the

58. *Id.* at 1231 (Rogers, C.J., concurring).

59. *See id.* (Rogers, C.J., concurring) ("The problem with drawing inferences from inaction is that in many cases there are plausible explanations for a defendant's failure to act that do not indicate consciousness of guilt.").

60. *See id.* at 1233 (Rogers, C.J., concurring); *supra* note 40.

61. *See supra* note 56 and accompanying text.

62. *(James) Johnson v. United States,* 398 A.2d 354, 365, 366 (D.C.1979) (emphasis omitted).

evidence of appellant's guilt. In the first place, as described above in Part I, the three eyewitness identifications of the clothing and hairstyle of the shooter were remarkably similar, and these squared with the identification by a fourth witness who did not see the shooting but identified a man whom he knew—appellant—with the same clothing and hairstyle running from the direction of the shooting seconds after it happened.

Second, appellant's brother testified that he had seen appellant leave the house within a half-hour before the shooting with "a gun on him," a nine-millimeter, the type of weapon an expert testified had been the murder weapon, based on an analysis of the bullets and shell casings recovered at the crime scene. Third, the harm from the funeral evidence itself was mitigated. Counsel for appellant elicited on cross-examination of appellants' sons that their mother's family held appellant responsible for the murder. While not eliminating all the prejudice from the funeral evidence, defense counsel at least was able to lessen its impact by offering appellant's reasonable explanation, in lieu of a guilty conscience, for staying away from the funeral.

Fourth, appellant declined the trial court's invitation to request an instruction limiting the use the jury could make of the funeral evidence.[63] This omission is likely explainable by the fact that the prosecution did not refer to that evidence during closing argument,[64] and thus defense counsel may have perceived that its impact would be minimal, especially because the jury had heard appellant's explanation for avoiding Bernadette Hamilton's funeral.

In the words of harmless error analysis, therefore, "we can say with fair assurance, without stripping the erroneous action from the whole, that the error did not sway the verdict."[65] Thus, there was no abuse of trial court discretion—no error requiring reversal—in the erroneous admission of the funeral evidence.[66]

### V.

We turn, finally, to the trial court's reinstructions of the jury after receiving two notes indicating first a difficulty, then a deadlock, in reaching a decision on first-degree premeditated murder while armed

**63.** *See Smith v. United States*, 777 A.2d 801, 809 n. 13 (D.C.2001) ("Defense counsel was given full opportunity to explain any arguments on this issue to the jury.").

**64.** *Cf. Henderson v. United States*, 632 A.2d 419, 432 (D.C.1993) (holding government argument prejudicial where "prosecutor improperly commented on, and repeatedly drew the jury's attention to, [appellant's] consultation with [his] attorney" as implying consciousness of guilt).

**65.** *Ebron v. United States*, 838 A.2d 1140, 1150 (D.C.2003) (citing *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see Mungo v. United States*, 987 A.2d 1145, 1157 (D.C.2010); *Mercer v. United States*, 724 A.2d 1176, 1194 (D.C.1999).

**66.** As noted in the text, an analysis of "abuse of discretion" in this jurisdiction (pursuant to

the *(James) Johnson* decision, *supra* note 62) requires us to determine whether a ruling committed to trial court discretion has been exercised "erroneously" and, if so, whether that error "is of a magnitude requiring reversal." Only if reversal is required do we say that there has been an "abuse of discretion." Other jurisdictions may state the analysis differently. For example, in *United States v. Copeland*, 321 F.3d 582, 599 (6th Cir.2003), the U.S. Court of Appeals for the Sixth Circuit ruled that the trial court had abused its discretion in admitting "threats" evidence but concluded that the abuse was "harmless"—an analysis that defines "abuse of discretion" to embrace only "error," leaving room for a separate inquiry into harm. Under either approach, however, there are two steps: Is there error? If so, is it reversible?

(hereafter, for simplicity, "first-degree murder").

## A.

In submitting the case to the jury initially, the trial court, without objection from counsel, gave the jurors the standard "acquittal first" instruction that they "should consider first whether the defendant is guilty of first-degree murder[;] do not consider second degree murder. If you find him not guilty of first[-]degree murder, go on to consider second degree murder." [67] This approach was reflected in the printed jury form.[68]

The jury began deliberations a little after 3:00 p.m. and was released just before 5:00 p.m. The next day, at around 12:50 p.m., the jury sent the judge a note: "If we cannot reach a unanimous decision about first[-]degree murder, should we continue to deliberate on that charge until a unanimous decision is reached, or should we take up the question of murder in the second degree?" Defense counsel asked for another "acquittal first" instruction, rather than a "reasonable efforts" instruction that would have permitted the jury to move on to consideration of second-degree murder without resolving first-degree murder.[69] The government preferred a "reasonable efforts" approach, but the court concluded that the case law supported a second "acquittal first" instruction. The next day, the jury sent the court a second note just before 2:45 p.m.:

The jury is split on 3A [first-degree premeditated murder while armed]. We have not changed our positions in the past 24 hours. We believe that we are deadlocked on that count. We have not considered 3B [second-degree murder while armed] based on your instructions as we understand them. We have reached a decision on 1, 2, 4, and 5.[70]

At this point, the government asked for a "reasonable efforts" instruction; the defense asked for a "mistrial" on first-degree murder, indicating counsel's belief that the jury was deadlocked on that count. The court initially asked whether an anti-deadlock instruction would be appropriate, then immediately shifted the focus, suggesting that case law appeared to give the defendant, but not necessarily the government, a right to request a "reasonable efforts"

---

67. *See* Criminal Jury Instructions for the District of Columbia, No. 4.201 (5th ed. rev.2011).

68. For the murder charged, the form provided:

3A. As to the charge of premeditated murder while armed, the jury finds the defendant: GUILTY _____ NOT GUILTY _____
[If the jury finds the defendant **GUILTY** of the above charge (# 3A), do not consider charge (# 3B). If the jury finds the defendant **NOT GUILTY** of the charge above (# 3A), the jury should consider the charge below (# 3B).]
3B. As to the charge of second[-]degree murder while armed, the jury finds the defendant: GUILTY _____ NOT GUILTY _____

69. A "reasonable efforts" instruction provides, more fully: "If, after making all reasonable efforts to reach a verdict on first-degree murder, you are not able to do so, you are allowed to consider second-degree murder." Criminal Jury Instructions for the District of Columbia, No. 4.201 B. Sometimes the instruction is called a "best efforts" instruction. *See, e.g., Powell v. United States,* 684 A.2d 373, 377 (D.C.1996).

70. According to the jury verdict form, these charges are:

1. Carrying a pistol without a license (January 1, 2008)
2. Threats
4. Possession of a firearm during a crime of violence or dangerous offense (murder)
5. Carrying a pistol without a license (March 22, 2008)

instruction.[71] The government replied that, upon deadlock, the court itself had authority to shift to a reasonable efforts instruction, citing (among other cases) *Carmichael v. United States*.[72] The court then asked, "If the jury is given a reasonable efforts instruction and they indicate at a later time that they are unable to reach a verdict, am I then precluded from an anti-deadlock instruction?" The government answered no because, in its second ("we are deadlocked") note, the jury did not indicate that it was deadlocked on the lesser charge of second-degree murder.

The court then indicated to defense counsel that it was considering a combined instruction: "an anti-deadlock instruction with reasonable efforts.... I would just add the reasonable efforts phrase ... probably towards the end." Defense counsel reiterated his desire for a mistrial as to first-degree murder. If the court was not going to declare a mistrial, he added, "then an anti-deadlock instruction would not be appropriate" and "we would oppose [rea-

sonable efforts]." Now agreeing with the court's inclination, the government said that it wanted the combined anti-deadlock and reasonable efforts instruction. The trial court agreed to give it.

After the trial court gave to counsel its version of the combined instruction, defense counsel observed, "I guess I can't voice an objection to it. It appears to take language from several of the instructions that are mentioned in the red book." The government asked the court to "highlight" the reasonable efforts portion because the jury had "asked twice" to consider second-degree murder. The court agreed to "point it out." Defense counsel then stated that it took "no position where [the reasonable efforts instruction is] located. We've objected to it."

Shortly before 3:30 p.m. on its second full day of deliberations, the trial court instructed the jury as follows, with the regular type reflecting essentially the *Winters* anti-deadlock charge;[73] the itali-

71. *See supra* note 69.

72. 363 A.2d 302, 303–04 (D.C.1976). In *Powell v. United States*, 684 A.2d 373, 381 n. 12 (D.C.1996), we summarized *Carmichael:*

> In *Carmichael*, the trial court gave a partial verdict instruction on the theory that if the jury could not agree on the greater offense, they might return a verdict on the lesser-included offense. 363 A.2d at 303. This occurred after the report of a deadlock and a *Winters* [*v. United States*, 317 A.2d 530, 534 (D.C.1974) (en banc)] [anti-deadlock] instruction. The next morning the jury requested instruction on the lesser-included offense and partial verdict. The court reinstructed on the former, but not the latter. Citing [*United States v.*] *Smoot*, [150 U.S.App.D.C. 130, 131–33, 463 F.2d 1221, 1222–24 (1972)], this court rejected appellant's claim that it was coercive to instruct the jury on the lesser-included offense. We noted that it was the jury which had requested instruction on the lesser offense and that the defense did not object. *Id.* at 304.

> We added in *Powell* that we did not read *Carmichael* "as having turned primarily" on "defense counsel's failure to object to reinstruction." *Powell*, 684 A.2d at 381.
>
> In *Carmichael*, where the jury received instructions on second-degree murder and involuntary manslaughter, this court explained that the "partial verdict instruction" was given in addition to the *Winters* anti-deadlock charge "on the theory that if the jurors could not agree on the greater offense they might be able to return a verdict on the lesser included offense." 363 A.2d at 303. Later, we expressed our understanding that the "partial verdict" instruction in *Carmichael* was the same as a "reasonable efforts" instruction. *See (Nathan) Jones v. United States*, 544 A.2d 1250, 1254 (D.C.1988) ("The *Smoot* and *Carmichael* decisions both approved the giving of a 'reasonable efforts' instruction when the juries were deadlocked on the greater offense." (citations omitted)).

73. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.601 B (5th ed. rev.2011). The *Winters* charge is found in *Winters*, 317

cized portion representing a combination of the *Thomas* and Gallagher anti-deadlock language;[74] and the underlined language reflecting the "reasonable efforts" instruction.[75]

In many cases absolute certainty cannot be attained or expected. Although the verdict must be the verdict of each juror and not a mere acquiescence in the conclusion of the other jurors, you should examine the questions submitted to you with candor and with proper regard and deference with the opinions of each other. You should consider that it is desirable that the case be decided, that you are selected in the same manner and from the same source from which any future jury must be and there is no reason to suppose that the case will ever be submitted to 12 persons more intelligent, more impartial or more competent to decide it or that more or clearer evidence will be produced on one side or the other.

And with this view, it is your duty to decide the case if you can conscientiously do so. You could listen to each other's argument with a disposition to be convinced. Thus, where there is a disagreement[,] jurors for acquittal should consider whether their doubt is a reasonable one which makes no impression upon the minds of others equally honest, equally intelligent with themselves, and who have heard the same evidence[,] with the same attention[,] with an equal desire to arrive at a fair verdict[,] and under the sanction of the same oath.

And on the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated and whether they should distress the weight or sufficiency of that evidence which fails to carry a conviction in the minds of their fellow jurors.

*The verdict must represent the considered judgment of each juror. As you know, in order to return a verdict it is necessary that each juror agree to that verdict. Your verdict with respect to each charge you consider must in and of itself be a unanimous verdict. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate ... to re-examine your own views and the reasons for your views [,] and to change your views [,] and to change your opinion [,] if you are convinced that it is wrong. This next sentence ... is a supplement to your previous responses that I have given to you about [the instructions for first-degree murder] and [second-degree murder]. In addition, if after making all reasonable efforts to reach a verdict on first-degree*

---

A.2d at 534. For a complete listing of the various instructions that a trial court may give when jurors cannot agree, see *Van Dyke v. United States*, 27 A.3d 1114, 1118 n. 4 (D.C.2011).

**74.** Criminal Jury Instructions for the District of Columbia, No. 2.601 A & C (5th ed. rev. 2011). The *Thomas* language, modeled on an American Bar Association standard, is drawn

from *United States v. Thomas*, 146 U.S.App. D.C. 101, 108 n. 45, 449 F.2d 1177, 1184 n. 45 (1971). The Gallagher instruction is found in Judge Gallagher's concurring opinion in *Winters*, 317 A.2d at 539 (Gallagher, J., concurring).

**75.** Criminal Jury Instructions for the District of Columbia, No. 4.201 B (5th ed. rev.2011).

*murder, you are not able to do so, you are allowed to consider second-degree murder, but do not surrender your honest convictions as to the weight or effect of evidence solely because of the opinion of your fellow jurors only for the purpose of returning a verdict. Remember, you are not partisans or advocates for either side. You are judges, neutral judges of the facts.*

Approximately one hour later, the jury reached a verdict.

## B.

Appellant argues that the trial court abused its discretion in giving this instruction because it was unduly coercive—"a non-standard form of the strongest anti-deadlock instruction infused with 'best efforts' language that permitted the jury to consider second-degree murder without resolving the first[-]degree murder charge."

We begin with fundamentals. As this court stated in *Wilson v. United States*, "[a] trial court is obligated to instruct a jury as to the proper order in which it should consider any greater and lesser included offenses that have been submitted to it." [76] Neither an "acquittal first" instruction nor a "reasonable efforts" instruction "is wrong as a matter of law," and both "present[ ] tactical advantages and disadvantages from the defendant's point of view." [77] For that reason, " 'the decision as to which instruction is preferable must be left to the defendant,' at least as an initial matter." [78] In this case, absent defense objection, the trial court initially gave the standard "acquittal first" instruction (reflected in the jury verdict form).[79] And, after the jurors' first note, the court honored appellant's request to repeat the "acquittal first" instruction.

Then came the jurors' second note, indicating they were "deadlocked" on

---

**76.** *Wilson v. United States*, 922 A.2d 1192, 1195 (D.C.2007).

**77.** *Id.* (internal quotation marks omitted). We have summarized these advantages and disadvantages in *(Robert) Jones v. United States*, 620 A.2d 249, 252 (D.C.1993) (citation omitted):

> The advantage of the "acquittal first" instruction, for the defendant, is that where the jury fails to agree on conviction or acquittal of the greater offense, it cannot adopt the easy compromise of convicting on the lesser offense. Thus, the defendant may escape any conviction at all, even where the evidence with regard to the lesser charge is fairly strong, and the government will have to decide whether the case merits the time and expense of mounting a new trial. The disadvantage of the "acquittal first" instruction is that, faced with a choice between a conviction on the greater offense and no conviction at all, jurors who might have preferred to convict only on a lesser offense may go along with others who are willing to convict on the greater offense, especially where there is a majority in favor of conviction on the greater charge. The "reasonable efforts" instruction presents similar advantages and disadvantages in reverse. It may lessen the probability that the jury will convict on the greater offense, but it may also increase the probability that the jury will convict on the lesser charge. Determinations as to which instruction is better for defendant will vary from case to case, depending upon the strength of the government's evidence and the defendant's own desires.

**78.** *Id.* (citations omitted) (quoting *(Robert) Jones*, 620 A.2d at 252) (internal quotation marks omitted). Although the standard practice is to charge the jury initially with an "acquittal first" instruction, "a defendant who timely requests the reasonable efforts instruction is entitled to it at the time of the initial charge to the jury." *Jackson v. United States*, 683 A.2d 1379, 1382 (D.C.1996) (citing *Wright v. United States*, 588 A.2d 260, 262 (D.C.1991)).

**79.** *See supra* note 68.

first-degree murder.[80] The defense asked for a mistrial while the government said it was time for a "reasonable efforts" instruction.[81] The government's request was solidly supported by this court's case law. In *(Nathan) Jones v. United States*,[82] we considered jury instructions applicable to greater and lesser drug offenses. After receiving an acquittal-first instruction, the jury announced a deadlock. The trial court gave a *Winters* anti-deadlock instruction. The jury remained deadlocked and asked whether it "could consider the lesser offense."[83] Defense counsel asked the court to grant the jury's wish, but the court repeated its "acquittal first" instruction. We ruled this was error, concluding that "*Carmichael*[84] and *Smoot*[85] implicitly permit an instruction that allows a jury deadlocked on the greater offense to consider the lesser without having to acquit on

the greater."[86] We then went further to hold that "when the jury reports a deadlock between the greater and the lesser offense, the 'acquittal first' instruction should not be given because it is impermissibly coercive."[87] We reasoned that, "[b]y giving the 'acquittal first' instruction in response" to the jury's request for permission to consider the lesser charge, "the trial court virtually ensured that the deadlock would be resolved in favor of the greater offense."[88] Accordingly, in the present case—especially because "acquittal first" had been used twice and the jury unequivocally announced a deadlock—the trial court had little, if any, choice but to shift from "acquittal first" to the language of "reasonable efforts." (Appellant claims no error in the court's refusal to grant his requested mistrial.)[89]

80. *See supra* text accompanying note 70.

81. Although defense counsel at trial objected to anti-deadlock and "reasonable efforts" instructions, he did so in the context of asking for a mistrial; thus, he did not question whether the jury was deadlocked. We have said that trial courts "need not accept at face value a jury's assertion of deadlock. Rather, the trial court has discretion to assess the totality of circumstances and require further deliberations if it doubts that the jury is 'genuinely' deadlocked." *Jackson*, 683 A.2d at 1383 (citations omitted). In this case, however, the jury's stated deadlock is not questioned.

82. 544 A.2d 1250, 1251–54 (D.C.1988).

83. *Id.* at 1251.

84. *Carmichael v. United States*, 363 A.2d 302, 303–04 (D.C.1976) (summarized *supra* note 72).

85. *United States v. Smoot*, 150 U.S.App.D.C. 130, 131–33, 463 F.2d 1221, 1222–24 (1972) (sustaining, as not unduly coercive, trial court request for jury "to come back tomorrow to see if they could reach a verdict on the lesser charge [manslaughter] even if [they] can't

agree on the greater charge [second-degree murder]").

86. *(Nathan) Jones*, 544 A.2d at 1252.

87. *Id.* at 1254.

88. *Id.*

89. The government also relies on *Powell v. United States*, 684 A.2d 373, 377 (D.C.1996), where the jury sent the court a note stating that "further deliberations are futile and amount to the majority attempting to coerce the minority." Over defense objection and request for a mistrial, the trial court gave a "reasonable efforts" instruction. *Id.* We sustained the trial court's ruling because, under these circumstances, "an 'acquittal first' reinstruction would [have been] too coercive" in favor of the greater offense. *Id.* at 379. According to appellant's brief, we should distinguish *Powell* because, in that case, three jury notes manifested "extreme" juror strife reflecting a need, not evident here, to move on to a "reasonable efforts" approach. This proffered distinction fails. Even if the level of jury strife may be relevant to the advisability of a "reasonable efforts" reinstruction, a deadlock without discord, as in this case, can be just as persuasive—indeed, as compelling in light of *(Nathan) Jones*—for a judge to conclude, in the exercise of sound discretion,

During oral argument, counsel for appellant conceded, in light of the foregoing case law, that if the trial court had shifted to a "reasonable efforts" instruction without more, that reinstruction would not have been improper. But, counsel stressed that addition of the anti-deadlock language to the "reasonable efforts" instruction upped the pressure to "undue coercion,"[90] amounting to "a direction to convict on the lesser included offense of second-degree murder while armed."

■■■ We have said on numerous occasions that "coercion of a verdict does not mean simple pressure to agree. Rather, pressure to agree is impermissibly coercive when it is likely to force a juror to abandon his [or her] honest conviction as a pure accommodation to the majority of jurors or the court."[91] On review, therefore, "we look to the particular circumstances of each case," evaluating "juror coercion from the perspective of the jurors."[92] We consider not only the jury instructions themselves but also "any actions of the trial court which may have exacerbated or alleviated the coercive potential of the situation."[93]

Appellant cites no trial court action, other than the instructions themselves, that contributed to jury coercion, so the only question remaining is whether there was undue coercion attributable to the court's addition of the anti-deadlock language. Whereas in *(Nathan) Jones* we reversed a conviction because we concluded that an "acquittal first" instruction after a *Winters* anti-deadlock charge would likely coerce a conviction on the greater offense, appellant posits that tacking an anti-deadlock instruction onto a "reasonable efforts" instruction would likely coerce a conviction on the lesser offense.

*(Nathan) Jones* is not the only case in which we have considered whether a combination of instructions unduly coerced a deadlocked jury. In *Carmichael*,[94] where a "partial verdict" (tantamount to "reasonable efforts")[95] instruction followed a *Winters* charge, we perceived no such coercion. In light of *Carmichael*, therefore, and given the discretionary role trial courts have in fashioning jury instructions to meet the particular circumstances at issue here,[96] we are not impressed by appellant's coercion argument.

that "reasonable efforts" deliberations are called for.

　More recently, we have said: "If the jury deadlocks on the greater charge, a defendant's initial preference for an 'acquittal first' instruction may be overridden. Under those circumstances, the trial judge has discretion to give a 'reasonable efforts' instruction over the defendant's objection in lieu of granting a mistrial if it concludes that repeating an 'acquittal first' instruction would be unduly coercive." *Wilson v. United States*, 922 A.2d 1192, 1195 n. 5 (D.C.2007).

**90.** *Green v. United States*, 740 A.2d 21, 26 (D.C.1999).

**91.** *Van Dyke v. United States*, 27 A.3d 1114, 1122 (D.C.2011) (alteration in original) (citation and internal quotation marks omitted).

**92.** *Green*, 740 A.2d at 26 (internal quotation marks omitted).

**93.** *Id.; compare Carmichael v. United States*, 363 A.2d 302, 304 (D.C.1976) ("The record discloses neither coercive words nor actions by the trial judge."), *with Blaine v. United States*, 18 A.3d 766, 783 (D.C.2011) ("[T]he particular combination of instructional language and trial court comment created a misdescription of reasonable doubt. . . .").

**94.** *See supra* note 72.

**95.** *See supra* note 75.

**96.** *See, e.g., Hankins v. United States*, 3 A.3d 356, 361 (D.C.2010) ("Whether to give an anti-deadlock instruction when a jury reports itself at an impasse, and which instruction to give, are questions committed to the trial judge's discretion.").

In the first place, in attempting to keep the jury from considering the lesser charge when it was deadlocked on the greater one, appellant is doubtless hoping for a hung jury and thus a mistrial. That goal has limits:

> While "a defendant is entitled to a jury in disagreement," "it is in the public interest . . . that a jury reach a verdict if it can reasonably do so." The trial court may not coerce a verdict, but it "should give a temperate prod to a 'hung jury' so as to bring out a verdict." [97]

Anti-deadlock instructions are available to this end.

Second, we agree with appellant's recognition in his brief that "[b]oth jury notes expressed some eagerness to consider the lesser charge"—a statement from which he pivots to argue that an anti-deadlock instruction, reinforcing the new "reasonable efforts" language, coerced the conviction of second-degree murder. In this statement about "jury eagerness," however, appellant downplays the fact that on each occasion the jurors faithfully reported (first implicitly, then explicitly) that they had not yet "considered" second-degree murder.[98] The deadlocked jury's eagerness to move on to the lesser offense, having not yet "considered" it, is markedly different from an eagerness to do so—as appellant wrongly suggests—having had it "under consideration from early on" despite what the second note said. As the trial court appears to have seen the situation, there-

[97]. *Powell v. United States*, 684 A.2d 373, 380 (D.C.1996) (citation omitted) (quoting *Epperson v. United States*, 495 A.2d 1170, 1174 (D.C.1985)). Similarly, we have stressed that "[j]ust as mistrials should not be lightly given, so trial courts can require that juries make strenuous efforts to 'do their job' before giving up in deadlock." *Jackson v. United States*, 683 A.2d 1379, 1384 (D.C.1996) (citation omitted) (quoting *Harris v. United States*, 622 A.2d 697, 701 (D.C.1993)).

[98]. Appellant supports his argument that the new instructions coerced the jury toward a conviction of second-degree murder while armed by contending that the jury appeared, from its notes, to have been deliberating prematurely on that charge. The notes themselves indicate that the contrary is true. The first note said, absent unanimity as to first-degree murder, "*should* we continue to deliberate on that charge until a unanimous decision is reached, or *should* we take up the question of murder in the second degree?" (Emphasis added.) The language used suggests concern about violating the court's instructions rather than implying that the jury has moved on to the lesser charge. Later, the second note said: "We have *not considered* 3–B [second-degree murder while armed] based on your instructions as we understand them." (Emphasis added.) Thus, no premature consideration of box "3–B" on the verdict form is indicated. Finally, when the government mentioned several times during discussion of the second jury note that the jury had not yet considered second-degree murder, defense counsel never disagreed.

Appellant also suggests that because, in its second note, the jury reported it had "reached a decision on counts 1, 2, 4, and 5," see note 70 and accompanying text, the jury must have reached a "compromise" verdict on second-degree murder, because a conviction of PFCV (count 4), for example, would have required, as a predicate, a finding that appellant had committed at least second-degree murder. This argument goes too far. The jurors were not instructed that they could not consider PFCV without first addressing the murder charges. It is therefore possible that they could have found possession of a firearm during an unresolved crime of violence without deliberating and voting on the second-degree murder charge in full, with some jurors premising PFCV on first-degree murder and others premising PFCV on an assumption that in time, when permitted full consideration of the lesser as well as greater offense, they would decide the degree of murder that took place. In any event, a decision on PFCV could not be final until the murder charge itself was finally resolved, and we are not persuaded that the indirect evidence of a compromise verdict that appellant suggests should trump the jury's express statement that it had not yet considered second-degree murder.

fore, the addition of anti-deadlock language in support of the shift to "reasonable efforts" language was responsive to the jury's desire to consider a new possibility, not coercive toward accomplishing a particular, previously signaled verdict.

Finally, although the trial court's new combination instruction led with the strongest (*Winters*) anti-deadlock language,[99] it softened the impact by adding the *Thomas*/Gallagher language,[100] then highlighting what, for the jury, were the emancipating words of the "reasonable efforts" instruction.[101]

We can understand why, in this situation, a trial judge might have moved forward more cautiously in two steps: a "reasonable efforts" instruction followed, if necessary, by an anti-deadlock instruction. Indeed, in both *Carmichael* and *(Nathan) Jones*, the court took a two-step approach (beginning, however, with the *Winters* charge). Nonetheless, given reasonable perceptions that the jury had been heading toward deadlock when it sent out its first note, and that by the second, "deadlocked" note the jury had still not taken up the lesser charge, we cannot say that the trial court abused its discretionary prerogative when it decided to group the two instructions together once the jury assuredly had deadlocked. In our judgment, therefore, the overall impact from the jury's perspective was a trial court request to "please keep trying"[102] under the new permission of a "reasonable efforts" instruction.

We have explained why we believe the particular reinstructions under the circumstances were salutary, not coercive. And, contrary to appellant's contention, our decision in *Carmichael*,[103] as well as our explications in the other cases cited, provide ample precedent for a trial judge, in the exercise of sound discretion, to give a deadlocked jury the kind of instruction at issue here: anti-deadlock coupled with "reasonable efforts." Case law, therefore, firmly supports the government's position. The trial court did not abuse its discretion in its choice and sequence of the challenged jury instructions.[104]

99. *See supra* note 73.

100. *See supra* note 74.

101. *See supra* note 69.

102. *Van Dyke v. United States*, 27 A.3d 1114, 1124 (D.C.2011) (quoting *Calaway v. United States*, 408 A.2d 1220, 1230 (D.C.1979)) (internal quotation marks omitted).

103. *Carmichael v. United States*, 363 A.2d 302, 303–04 (D.C.1976); *see supra* note 72.

104. Appellant raises another argument, for the first time, in his reply brief, contending that the "trial court erred in permitting the prosecutor to argue to the jury facts not in evidence, and to distort evidence regarding motive, identity, and weapons possession." Normally, we do not consider arguments raised for the first time in a reply brief. *See, e.g., Levelle, Inc. v. D.C. Alcoholic Bev. Control Bd.*, 924 A.2d 1030, 1038 n. 9 (D.C.2007) ("[N]or do we allow new arguments to be made in a reply brief."); *Johnson v. District of Columbia*, 728 A.2d 70, 75 n. 1 (D.C.1999) ("An appellant may not use the reply brief to raise new issues."). Summarily, however, we shall address his two principal concerns, neither of which has merit.

Seeking plain error review, appellant contends that during opening statement and closing and rebuttal arguments, the government distorted the evidence of appellant's threats on the life of Bernadette Hamilton during the argument about divorce papers on or about March 4, 2008. Their son, Myrone, testified at trial that, while he was upstairs, he heard his parents arguing downstairs over divorce papers and heard appellant say that he would "kill [Ms. Hamilton] and then kill [him]self," whereupon Myrone saw his father retrieve from upstairs a "black thing" (Myrone identified it as a "knife") and walk downstairs and out the door. Appellant maintains that, in stressing this testimony to the jury, the government distorted the evidence because the defense had impeached Myrone with a videotaped interview "soon after the murder." In

\* \* \* \* \* \*

We have concluded that the evidence is sufficient for conviction on all counts; that appellant's constitutional right to due process was not violated by the trial court's discretionary decision to keep him in leg shackles during the major portion of the trial; that the trial court did not abuse its discretion in admitting evidence that appellant claimed was prejudicial, or in giving the deadlocked jury a combination anti-deadlock/"reasonable efforts" instruction. Accordingly, the judgment on appeal is

*Affirmed.*

that interview, Myrone had indicated that the incident with the knife occurred over a year earlier. But even if the knife incident occurred in March 2008, says appellant, the prosecutor distorted the evidence by arguing repeatedly that appellant had "brandished" or "displayed" the knife during the argument with his wife. We see no plain error. On redirect examination, Myrone Williams reconfirmed that the threat occurred during the argument over divorce papers, just before his mother and the police took him to his grandmother's house (all of which occurred in March 2008, not one year earlier). And in any event, whatever ambiguity may have remained from Myrone's testimony, it did not undermine his statement that appellant had threatened to kill his wife and then himself.

Appellant's other principal concern, again asking for plain error review, is the prosecutor's assertions during opening statement, closing argument, and rebuttal argument that Mosley saw appellant carry a nine-millimeter handgun from the bedroom and out of the house on the night of the murder. As noted above in part I, Mosley testified at trial that appellant "did have a gun on him," a "nine . . . [m]illimeter." Mosley further testified that the gun had been "in [Mosley's] room on the floor" and was gone when appellant left." Again, on plain error review, the alleged distortion is insufficient for reversal.